UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| In re: | ) |
| | ) |
| BRIAN THOMAS DOWNING | ) Case No. 07-11386-SSM |
| | ) (Chapter 13) |
| *Debtor.* | ) |
| | ) |

## OBJECTION BY CREDITORS CHARLOTTE M. PERRY AND KUDER, SMOLLAR & FRIEDMAN, P.C TO CONFIRMATION OF DEBTOR'S CHAPTER 13 PLAN

Charlotte M. Perry and Kuder, Smollar & Friedman, P.C., through counsel, object to the confirmation of the Chapter 13 Plan submitted by the Debtor, Brian Thomas Downing ("Downing" or "the Debtor"), dated June 22, 2007 (the "Plan"), on the basis that: (a) the Plan, which allows the Debtor to continue living the same lavish lifestyle that he led pre-bankruptcy, is not proposed in good faith; (b) the Plan improperly characterizes certain claims for support as unsecured, non-priority claims; (c) the Plan fails to provide for timely payment of future support claims, creating a financial hardship for Ms. Perry and the young daughters born of the marriage of the Debtor and Ms. Perry; and (d) the Plan payments are premised upon expenses which have been inflated.

In further support of her objection, Ms. Perry states as follows:

### Background

1. The Debtor filed a voluntary chapter 13 bankruptcy petition on May 31, 2007 (the "Petition Date").

2. Prior to the Petition Date, on April 27, 2001, the Debtor and Ms Perry were married. During the marriage, the parties produced two children, who are currently ages three

and six. The Debtor and Ms. Perry ceased living together in August of 2004 and were legally separated in April 2005.

3. The Debtor and Ms. Perry are parties to a divorce proceeding entitled *Brian Downing v. Charlotte Perry*, Civil Action No. 05 DRB-1909, in the Superior Court of the District of Columbia, Family Court, Domestic Relations Branch (the "Family Court Proceeding").

4. On July 25, 2006, the Debtor and Ms. Perry executed a *Voluntary Separation and Property Settlement Agreement* (the "Separation Agreement") which addressed the settlement of marital property, alimony and child support, and custody issues associated with the divorce.

5. On December 20, 2006, the divorce of Ms. Perry and the Debtor became final.

6. On December 10, 2006, Ms. Perry filed a *Motion to Compel Performance of Voluntary Separation Agreement* ("Motion to Compel") in the Family Court Proceeding. The Motion to Compel seeks redress for the Debtor's repeated violations of the provisions of the voluntarily negotiated Separation Agreement, including the Debtor's: (i) failure to pay support and alimony in accordance with the terms of the Separation Agreement; (ii) refusal to perform numerous financial or administrative tasks, causing additional financial hardship to Ms. Perry and the children; (iii) repeated violations of the visitation provisions; and (iv) refusal to cooperate with Ms. Perry on issues concerning the health, education and welfare of the children.

7. On April 30, 2007, Ms. Perry filed the *Defendant's Supplement to Motion to Compel Performance of Voluntary Separation Agreement* (the "Supplemental Motion"). The Supplemental Motion sought to update the Motion to Compel by including not only new violations of the Separation Agreement that had not occurred at the time of the original motion, but also statements that a small number of issues raised by Motion to Compel had been resolved.

8. A hearing on the Motion to Compel and Supplemental Motion has been rescheduled on several occasions due to scheduling conflict issues, and was most recently postponed due to the automatic stay resulting from the bankruptcy petition filed by Debtor.

9. On June 26, 2007, Ms. Perry and her attorneys filed the *Motion for Relief From Automatic Stay by Creditors Kuder, Smollar & Friedman, P.C. and Charlotte Perry* (the "Motion for Relief") in order to obtain a Bankruptcy Court order permitting her to proceed on the Motion to Compel in the Family Court Proceeding. The stay has been lifted to allow Ms. Perry to proceed with respect to the non-financial issues raised by the Motion to Compel and future support matters only.

## Plan Is Not Proposed in Good Faith

10. The Debtor is a man of substantial means, earning a gross income of $42,000 per month. The Debtor's *admitted* disposable income, after deducting allowed expenses including proposed Plan payments, is $6,910.48 per month, according to his *Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income* (the "Income Statement"), yet the Debtor's Plan calls for payments to creditors of a mere $2,000 per month for the first eighteen months. Given the Debtor's income, this is an outrageous proposal that creates a financial hardship for Ms. Perry and the children. The Debtor can afford to pay all of his debts within approximately twenty-two months by utilizing only the disposable income to which he admits. The Plan is additionally egregious in that it is premised upon inflated expenses. If the Debtor were to cut back on his proposed expenses, as is set forth in more detail herein, he could easily pay his creditors even more quickly.

11. As set forth above, by his own admission, the Debtor has disposable income of $6,910.48 per month, as is set forth in the Income Statement. Part V. Subpart C, line 50 of the

Income Statement permits a debtor to average his plan payments across the life of the Plan. The Debtor lists his average Plan payment as $5,419.32 per month, yet the Debtor proposes to make plan payments of only $2,000 per month for the first 18 months. Due to the averaging, the Debtor has understated his disposable income for each of those 18 months by $3,419.32. The Debtor's Plan provides for a back loading of Plan payment such that the most significant dollar payments under the Plan occur after eighteen months have passed. The Debtor's average Plan payment is therefore significantly higher than the actual Plan payment proposed during the first eighteen months. If the "average" Plan payment figure is recalculated to reflect the actual Plan payment for the first 18 months, the Debtor has disposable income of $10,329.80 per month to contribute to the Plan in addition to the proposed $2,000 per month. With the use of this amount of disposable income, the Debtor could pay his unsecured debts in full in approximately sixteen months.

12.     Prior to the Petition Date, the Debtor lived an extravagant lifestyle that he will be permitted to continue, at the expense of his creditors, if the Court were to confirm his Plan as proposed.

13.     The Debtor is required to travel extensively as part of his employment and the expenses he incurs for business are reimbursed. During the parties' marriage, however, Ms. Perry became aware of the Debtor's tendency to spend very large sums of money on travel and entertainment unrelated to his employment, including airfare, hotels, rental cars, meals, and alcohol. The travel occurred primarily without the Debtor's family and continues to this date.

14.     During the Family Court Proceeding, Ms. Perry and her accountant, Lori Bunker, subpoenaed the Debtor's records in order to determine, among other things, the amount of travel that the Debtor engaged in that was unrelated to business. This was determined by comparing

the Debtor's credit card receipts, hotel and airline records to the expense reports that the Debtor submitted to his employer for reimbursement.

15. For the year 2005, the Debtor charged $234,406.13 on his credit cards and was reimbursed by his employer in the amount of $95,757.73. Examples of significant expenditures, unrelated to work and away from his family, for the year 2005 include forty-one (41) nights in hotels during the first five months of the year. Ms. Perry did not obtain the Debtor's reimbursement reports for the period after May 2005. In 2004, the Debtor charged $169,481.71 on his credit cards and was reimbursed by his employer in the amount of $121,338.22. During that year, the Debtor spent 220 nights away from home and without his family but was reimbursed by his employer for only 118 nights in hotels.

16. The Debtor has never owned real property, drives a 2001 VW Jetta, for which he reports no car payments, and has a very modest 401k balance for a man of his means, with a loan that has been taken against it. The Debtor dropped his separate Life Insurance policy for the benefit of the children, apparently after the Separation Agreement was executed. Even with the Debtor's support obligations, he has few fixed expenses and his income provides him with the means to live a more than comfortable lifestyle. The mere fact that he accrued the debt he has reported on his Schedule of Assets and Liabilities when he earns an income of $42,000 per month is an indication of his bad faith.

17. Other examples of the Debtor's lifestyle include the following:

    (i) Within two weeks of the Petition date, Debtor took two expensive vacations with his daughters. The day after the Petition Date, June 1, 2007, the Debtor took his two daughters to New York City for the weekend and spent $728.25 at the Sheraton Suites on the Hudson,

5

which figure includes the room rate and six charges at the Harbor Bar. The Debtor also paid for three round trip train tickets for the weekend. The least expensive rate for round-trip train tickets, one adult and two children, between Washington, DC and New York City is currently $314.00. One week later, on June 9, 2007, the Debtor took his two daughters to Santa Monica, California for 5 nights. One-way airline tickets with JetBlue airlines for the three traveling home on June 14, 2007 were close to $1,000 alone. In addition, Debtor spent five nights at the Lowes Hotel Santa Monica at a rate of $337.00 per night ($1685.00 total), purchased roundtrip tickets on United Airlines, and enjoyed three meals out per day.

(ii) From December 25, 2006 through January 1, 2007, the Debtor traveled with his two daughters to Santa Monica, California, where they stayed at the Oceana Hotel in a one-bedroom King Lanai. The advertised rate for this room type is $464 per night during the Christmas season. In addition, the Debtor charged $354.12 to the room for items including alcohol and other items purchased from the honor bar, room service and in-room games. The Debtor traveled with the girls on United Airlines. The least expensive advertised rate on expedia.com for three round trip tickets between Washington, DC and Los Angeles, California during this time period is $244 per person or $732.00 total.

(iii) From October 12, 2006 through October 15, 2006, the Debtor stayed with his two daughters for the weekend at Le Parker Meridien in New York City. The advertised room rate for the least expensive room in the hotel is $415 per night. The Debtor also paid $776.15 in room charges, which included charges for a hotel babysitter, alcohol and other items from the minibar. The Debtor traveled to New York with his daughters by train.

(iv) When traveling for personal reasons or for business, the Debtor routinely upgrades his flights to First or Business class, generally at his own expense. According to United Airlines, this requires that he purchase a more expensive upgradeable coach ticket and pay an upgrade fee. The Debtor regularly stays at luxury hotel chains including the Ritz Carlton, Four Seasons, Lowes, Le Meridian, Sheraton, and Westin.

(v) In April 2006, the Debtor spent approximately $3,400 on two airline tickets to Europe for a twelve-day vacation in Italy with a female companion. On November 20, 2005, the Debtor spent $3,852 on two airline tickets to Edinburgh with the same companion.

(vi) On May 12, 2004, the Debtor wrote two checks to himself on his Visa card for $4,950.00 and $4,975.00 respectively. Two days later, on May 14, 2004, he wrote another check to himself on his Visa card for $4,980.00.

18. For calendar years 2001 through 2006, the Debtor's gross income as Vice President and Publisher of Recorded Books, LLC has increased, annually, from $230,000 in 2001 to $507,621.50 in 2006. His reported income in 2007, as reflected in his Statement of Affairs, is projected to be on a track similar to 2006. History reflects a regular upward trajectory of the Debtor's income, which includes commissions and bonuses, each year. In light of Debtor's extremely high income, the proposal that he pay only $2,000 per month for the first eighteen months is egregious. This is less than 5% of his total income.

19. With his Plan, the Debtor attempts to take advantage of the provisions of 11 U.S.C. § 1322 permitting Plan payments to be made over a period of five years as long as creditors are paid in full. This provision was clearly designed for an average debtor with significantly less annual income. Given his income level, the Debtor's proposal to stretch his payments to creditors out over five years makes a mockery of the spirit and purpose of the Bankruptcy Code. The Debtor has the means to pay significantly higher monthly payment than is provided for in the Plan. As such, the Debtor's Plan is not proposed in good faith.

**The Debtor Should Be Required to Demonstrate Compliance with §§ 1308 and 1325(a)(9) Prior to Confirmation of a Plan**

20. During the years 1996 through 2005, the Debtor failed to file tax returns and concealed this fact from Ms. Perry. The Debtor's unwillingness to produce tax returns to Ms. Perry became one of many factors that contributed to their eventual divorce. During the Family Court Proceedings, Ms. Perry subpoenaed the tax returns and made over a dozen requests through counsel for them. On the eve of the pre-trial hearing, the Debtor produced unsigned returns for tax years 2000 through 2005, which reflected that Debtor owed $140,000 to the IRS. Furthermore, the Separation Agreement specifically includes the Debtor's representation that he owed $140,000 in tax debt to state and federal taxing authorities. The Debtor's tax debt and

certain other debts claimed by the Debtor provided the basis for his argument that he was entitled to pay less child support than DC child support guidelines require. The Debtor's schedules, filed in the Bankruptcy Court, indicate that the Debtor's unsecured priority debt owed to the IRS is $44,596.98 and that his unsecured, non-priority debt to the IRS is $28,443.03. Total tax debt reported by the Debtor in his Schedules is $86,201.30. The Debtor should be required to reconcile the inconsistencies between his representations to Ms. Perry in the context of the Family Court Proceeding and his representations to the Bankruptcy Court regarding his debt to the IRS. If the Debtor has in fact paid down his tax debt by approximately $60,000 or $70,000 in a period of ten months or less, depending on when the repayments began, then the Debtor certainly has the ability to pay his current creditors at a similar rate. In this context, the Debtor's proposed Plan Payments are ludicrous.

21. The Debtor has not provided evidence to Ms. Perry that tax returns were filed for the period of their marriage or thereafter. At the Debtor's 341 meeting, the Debtor testified that all tax returns through 2005 had been filed approximately one year ago. To Ms. Perry's knowledge, he did not produce them or his 2006 tax return to the Chapter 13 Trustee. The Debtor stated at the 341 meeting that he had filed for an extension for the tax year 2006.

22. The Court should not confirm the Debtor's Plan without evidence that all of the Debtor's tax returns have been filed in accordance with 11 U.S.C. §§ 1308 and 1325(a)(9) and that such information has been provided to the Chapter 13 Trustee.

**Plan Improperly Characterizes Priority Support Claims as Unsecured, Non-Priority**

23. The Separation Agreement provides, among other things, for the Debtor to pay Ms. Perry the sum of $75,000 (the "Reimbursement") as reimbursement for her attorney's fees and costs, accountants' fees, and other debt incurred in connection with the Family Court

Proceeding. The Reimbursement is partially payable directly to Ms. Perry, and partially payable to Ms. Perry's attorneys and accountants.

24. The portion of the Reimbursement owed to Ms. Perry directly totals $22,000 (the "Perry Reimbursement"), payable as follows: (1) $5,000 to be paid to Ms. Perry on April 15, 2007; and (2) $17,000 to be paid to Ms. Perry beginning in January 2008, at a rate of $3,000 per month, until the balance is paid in full. The Debtor is required to pay any interest incurred on the $17,000, which represents credit card debt, if his payments are not paid in full and on time.

25. The portion of the Reimbursement owed to Kuder, Smollar & Friedman, P.C. (the "Kuder Reimbursement") directly totals $37,500, payable at a rate of $2,500 per month for fifteen months commencing September 15, 2006.

26. The portion of the Reimbursement owed to Lori Bunker (the "Bunker Reimbursement") directly totals $15,500, payable as follows: (1) the sum of $3,000.00 no later than August 15, 2006; (2) $500.00 per month beginning on October 15, 2006 and continuing for a period of ten (10) months; and (3) the sum of $7,500.00 no later than April 15, 2007. Ms. Bunker received the $3,000 payment on August 21, 2006 and has received only the first of the $500 monthly installments, which she received on October 22, 2006. She has received no other payments from the Debtor.

27. The Plan improperly treats the Perry Reimbursement and the Kuder Reimbursement as unsecured, non-priority claims rather than priority claims pursuant to 11 U.S.C. § 507(a)(1). All three claims constitute support. The first installment payment of $5,000 for the Perry Reimbursement, the first eleven (11) installments for the Kuder Reimbursement and all of the monies owed to Ms. Bunker are past due. The balances are to be paid pursuant to the terms of the Separation Agreement over a period of months, and not over five years as

provided by the Plan. The Debtor's proposal to pay the Reimbursement in a manner contrary to the provisions of the Separation Agreement violates the requirements of 11 U.S.C. § 1325 (a)(8).

28.  The Plan improperly treats the Reimbursement, including the Perry Reimbursement, the Kuder Reimbursement, and the Bunker Reimbusement, as an unsecured, non-priority claim. The Reimbursement should be treated as a priority claim in compliance with 11 U.S.C. § 507(a)(1).

29.  The Plan also improperly treats Barbara's Montessori School's claim for past due tuition for the parties' daughter as an unsecured, non-priority claim (the "Montessori Claim"). Pursuant to the terms of the Separation Agreement, the Debtor is liable for the payment of this claim as a part of his child support obligation. The Montessori Claim is a support claim should be treated as a priority claim pursuant to 11 U.S.C. §507(a)(1).

### Plan Fails to Provide for Timely Payment of Continuing Support Claims

30.  The Motion to Compel seeks an order requiring the Debtor to pay support and alimony on a timely basis. The Debtor often mails child support and alimony payments rather than wiring them, as provided for by the Separation Agreement, causing support and alimony to be paid late, and therefore causing financial hardship to Ms. Perry, who is not employed, and the children. Even when the Debtor wires the payments, the transfers are generally late. For example, the payment due July 15, 2007 was wired on July 19, 2007. The Plan should not be confirmed unless the Debtor is making timely payments of ongoing support and alimony in accordance with the provisions of the Separation Agreement and pursuant to the requirements of 11 U.S.C. § 1325 (a)(8).

31. The Plan should not be confirmed until the financial issues set forth in the Motion to Compel that address the timeliness of the Debtor's ongoing support payments are resolved in the Family Court Proceeding.

### Plan Payments Are Based Upon Inflated Expense Payments

32. The Debtor's personal expenses could and should be further reduced, providing the Debtor with an even greater disposable income. Defendant overstates many of his budget items and includes expenses that he does not currently owe, such as: (i) an allowance of $750 per month for food set forth in Schedule J, a large number, especially for someone who travels for business and is reimbursed for meals; (ii) payment of $1,500 per month for a parent coordinator, when the parties do not currently work with a parent coordinator, and, according to information obtained from the previous parent coordinator, the Debtor made no payments to her during the time the she was employed, despite the fact that the she submitted a bill to both parties; (iii) a $1,500 per month payment to Murray & Kavanaugh, when this debt should be paid in full by this time; (iv) a $1,200 per month payment for private school tuition and a $250.00 per month charitable contribution to the school, when there is no agreement between the joint custodians to place the child in private school and Ms. Perry has requested that she be permitted to enroll their older child in public school. Should Ms. Perry prevail on this request, which will be addressed in the Family Court Proceedings, the Debtor would have these additional funds to devote to Plan payments.

33. In the context of the Family Court Proceedings, the Debtor submitted a proposed budget to Ms. Perry that is inconsistent with the budget that he has submitted to the Bankruptcy Court. Examples of the inconsistencies are set forth as follows. (1) The Debtor represented that his debt for federal and state taxes was $140,000, yet his Schedules of Assets and Liabilities filed

with the Bankruptcy Court and submitted under the pains and penalties of perjury, indicates priority tax debt of $57,515,00 and unsecured, non-priority tax debt of $28,686.30, totaling $86,201.30. (2) The Debtor represented to Ms. Perry in the Family Court Proceedings that his 401k account contained $40,000 after consideration of the $49,000 loan against the account. On the basis of that information, Ms. Perry waived her right to any portion of the Debtor's 401k account in the parties' Separation Agreement. The Debtor's schedules show that his 401k account contains $110,874.54. (3) The Debtor represented to Ms. Perry that he owed his law firm, Thyden Gross & Callahan the sum of $43,000, yet his Schedules indicate that the firm is owed $25,000. The Debtor has therefore paid his own law firm close to $20,000 in the past ten months while allowing other creditors to remain unpaid. (4) According to the documents filed in this proceeding, the Debtor's American Express credit card debt has increased by $12,000 since the time when he submitted his list of assets and liabilities to Ms. Perry in the context of the Family Court Proceedings. The Debtor should be required to provide an explanation of these inconsistencies.

### Applicable Law

34.  A chapter 13 debtor has the burden of proving that his proposed plan was filed in good faith, as required for confirmation pursuant to 11 U.S.C. § 1325(a)(3). See In re Moroney, 330 B.R. 527, 530 (Bankr.E.D.Va. 2005), *citing*, In re Carpenter, 318 B.R. 645 (Bankr.E.D.Va. 2003). The Fourth Circuit applies a "totality of the circumstances" analysis to determine whether a Chapter 13 plan has been proposed in good faith. Moroney, 330 B.R. at 530, *citing*, Neufeld v. Freeman, 794 F.2d 149, 152 (4th Cir. 1986). Factors considered by the Fourth Circuit include (1)

13

percentage of proposed repayment; (2) debtor's financial situation; (3) period of time for payments; (4) debtor's employment history and prospects; (5) nature and amount of unsecured claims; (6) debtor's previous bankruptcy filings; (7) debtor's honesty in representing facts; and (8) any unusual or exceptional problems facing the debtor. Neufeld, 749 F. 2d at 152.

35. In considering the Debtor's (i) steady employment with the same employer for the past thirteen years, (ii) regular, upward trajectory in income during that time; (iii) amount of unsecured debt compared to level of income; (iv) the period of time proposed to repay his debts, to the detriment of his creditors, that enables him to continue living an extravagant lifestyle; (v) the Debtor's failure to devote all of his disposable income to his Plan payments; and (vi) the Debtor's lavish lifestyle, the Court should find that the Debtor has not met his burden of demonstrating that his Plan has been filed in good faith.

36. The Debtor's Income Statement does not accurately reflect his ability to pay his creditors much more rapidly under the currently proposed Plan. "If circumstances dictate that neither Form B22C nor Schedules I and J accurately portray the debtor's income (less the Income Exclusions) projected over the plan commitment period, the Bankruptcy Court must make a fact-based determination at the time of confirmation, whether by way of the parties' agreement or the taking of evidence." Kibbe v Sumski, 361 B.R. 302, 314 (1st Cir. BAP 2007). "Said most directly, the object is not to select the right form, but to reach a reality-based determination of a debtor's capabilities to repay creditors. This object, we believe, best preserves both the congressional formulation of § 1325(b) and the unaltered twin mandates of the Bankruptcy Code: a fresh start for the honest debtor and a uniform and equitable distribution to creditors." Id.

WHEREFORE, for the foregoing reasons, Charlotte Perry and Kuder, Smollar & Friedman, P.C. respectfully pray that the proposed Plan of Brian Thomas Downing dated June 22, 2007 not be confirmed.

> Respectfully submitted,
>
> /s/ Michelle L. Geppert
> Michelle L. Geppert, Esquire
> VA Bar No. 71014
> Kuder, Smollar & Friedman, P.C.
> 1350 Connecticut Ave, N.W.
> Suite 600
> Washington, D.C. 20036
> Office: (202) 331-7522
> Fax:    (202) 331-0388
>
> Attorney for Charlotte Perry and
> Kuder, Smollar & Friedman, P.C.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of July 2007, a copy of the foregoing Objection By Creditors Charlotte M. Perry and Kuder, Smollar & Friedman, P.C. to Confirmation of Debtor's Chapter 13 Plan was served by first class mail, postage prepaid to:

Brian Thomas Downing
1401 S. Joyce St., #810
Arlington, VA 22202
Debtor

Steven B. Ramsdell, Esq.
Tyler, Bartl, Gorman & Ramsdell, P.L.C.
700 S. Washington St.
Suite 216
Alexandria, VA 22314
Attorney for Debtor

Gerald M. O'Donnell
211 North Union St.
Suite 240
Alexandria, VA 22314
Bankruptcy Trustee

_____
Michelle L. Geppert